UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

BRANDON LEE

                         Plaintiff,

              - against -

THE CITY OF NEW YORK; New York City Police
Department Detective JOHN SEEL; New York City
Police Detective LIZBETH KLEIN; New York City
Police Sgt. DAVID ZAYAS; QUEENS COUNTY
DISTRICT ATTORNEY'S OFFICE; and "JOHN
and/or JANE DOES" # 1-10 who are currently
unknown members of the New York City Police
Department; all of whom are being sued in their
official and individual capacities,

                     Defendants.

------------------------------------------------------------------- X

**COMPLAINT**

**JURY TRIAL
DEMANDED**

    Plaintiff BRANDON LEE, by and through his attorneys, the undersigned, states as follows:

<u>PRELIMINARY STATEMENT</u>

    1.    This is a civil rights action against the City of New York based on and arising out of wrongful acts and omissions of the New York City Police Department and certain of the employees and agents of these offices, and against named individual employees and agents of these offices, in which the Plaintiff, BRANDON LEE seeks relief for the violation of his rights secured by the Fourth, Fifth, Sixth, and Fourteenth Amendment to the United States Constitution, and of his rights secured under the laws and Constitution of the United States as well as the laws and Constitution of the State of New York.

2.     Mr. Lee seeks damages, both compensatory and punitive, an award of costs and attorney's fees, and such other and further relief as this court deems just and proper, for having spent over two decades in prison for crimes he did not commit. Although he consistently maintained his innocence at trial and throughout his numerous years in prison, Mr. Lee was branded as a criminal from his arrest on October 23, 2018,[1] and held as a prisoner on Riker's Island until his acquittal on January 24, 2024.

## STATEMENT OF FACTS

3.     Plaintiff BRANDON LEE was acquitted of felony murder, robbery, and related offenses in the County of Queens under Indictment Number 425/2019 on January 24, 2024.

4.      He was unlawfully incarcerated for roughly five years and three months from his arrest on October 23, 2018 to the date of his acquittal on January 24, 2024.

### The underlying criminal case

### The Investigation and Ensuing Prosecution

5.     On Monday October 1, 2018 at approximately 3:45AM Queens Night Watch Detectives responded to the parking lot of the Multiplex Cinemas Movie Theatre located at 28-55 Ulmer Street for a male shot DOA.

6.     Upon the Detectives arrival they interviewed a complaining witness Madison Swenton, who, at the time, was a 23 year old female, who stated that at

---

[1] Mr. Lee was arrested in Florida pursuant to a warrant on or about October 23, 2018, and then extradited to New York on November 1, 2018.

approximately 12AM, she along with her boyfriend, the deceased, Jaquan Campbell, a 23 year old male, and fifteen of their friends were inside of the Angels Gentlemen's Club located at 32-17 College Point Blvd attending a birthday party for a friend of her boyfriend's named "Lucky".

7.      She stated everything was going well and there were no problems inside the club. Ms. Swenton stated that at approximately 2:55AM her boyfriend huddled up with a group of his friends inside the club and then he walked over to her and stated, "It's time to go. Right around this time bad things happen".

8.      Ms. Swenton stated that she and her boyfriend entered her black 2017 Lexus SUV NY reg. HRF-5912 and headed to the Whitestone Expressway North Service Road and as they were on that road she felt her vehicle being hit from behind by a Black BMW SUV. Ms. Swenton stated she was hit a few more times. While her car was being rammed by the BMW, passengers in the BMW were shooting at her and her boyfriend.

9.      Ms. Swenton stated that as her boyfriend was driving, the BMW pulled up next to them and in an attempt to escape her boyfriend sideswiped the BMW causing it to spin out and crash into a guard rail and also causing her vehicle to spin around.

10.     Ms. Swenton stated that her boyfriend fled southbound into oncoming traffic and then proceeded to turn left onto Linden Place and then turn left onto 28th Avenue. Ms. Swenton stated that her vehicle became difficult to drive from the damage it received so she and her boyfriend pulled over on 28th Avenue next to the

Multiplex Cinemas rear parking lot located at 28-55 Ulmer Street to assess their vehicle damage.

11.     Ms. Swenton stated she observed three black males and one male wearing a black ski mask armed with a firearm running towards them from the Multiplex Cinemas parking lot. Ms. Swenton stated the male with the firearm fired several times striking her boyfriend in the right shoulder and then they were immediately pulled out of her vehicle and thrown to the ground.

12.     Ms. Swenton stated all four males entered her vehicle and fled westbound on 28th Avenue. Ms. Swenton called 911 from her boyfriend's cell phone as her cell phone was still inside her vehicle that had just been taken. EMS responded and pronounced Jaquan Campbell dead at 3:27AM.

13.     Det. John Seel was assigned as lead investigator from the 109th Precinct Detectives Squad. Det. Lizbeth Klein was assigned to assist Det. Seel from Queens North Homicide Bureau.

14.     The Detectives interviewed witnesses Brianna Jackson and Krystle Black and both stated that they were on the Whitestone Expressway Service Road driving in Brianna Jackson's 2015 White BMW when they observed one vehicle collide with another vehicle. They both stated they heard gunshots.

15.     Ms. Jackson stated that shots came through her vehicle, which is when she put the vehicle into reverse at a high speed causing her vehicle to get stuck on the median of that street. Both Brianna Jackson and Krystle Black stated they were at the Angels Gentlemen's Club earlier in the night but they did not know the

deceased, Jaquan Campbell, or Madison Swenton and they could not identify any vehicles or shooter as it happened too fast for them to see anything.

16.    The 109th precinct responded and was able to recover Madison Swenton's Black 2017 Lexus SUV at the corner of 120th Street & 26th Avenue utilizing the find my I-Phone App.

17.    Approximately thirty (30) feet away from the vehicle was a semi-automatic firearm recovered with an extended magazine. The Black BMW SUV that the perpetrators were driving in was recovered on the corner of Ulmer Street & Whitestone Expressway Service Road. Inside the vehicle was a black/silver semi-automatic firearm along with multiple unknown caliber shell casings, three cell phones, a lighter, a baseball hat, and a black plastic mask. At the shooting location of Jaquan Campbell there were two (2) 9mm caliber shell casings recovered in the street. A Mac 10 semiautomatic firearm along with two pairs of latex gloves and three ski masks were recovered opposite of 30-50 Whitestone Expressway.

18.    Investigators conducted a video canvass, which revealed several locations that were unable to be viewed at the time of the canvass. Multiple videos were retrieved.

19.    Investigators also responded to the Angels Gentlemen's Club located at 32-17 College Point Blvd and interviewed Security Guard Kyle Figueroa who stated he worked his shift of 11PM to 5AM at the rear door of the location and there was only one dispute during the night at approximately 3:45AM between a promoter

named Hollywood Chuck and a female bartender. Hollywood Chuck was escorted out of the location without further incident.

20.    The Detectives interviewed manager Nicholas Kaglos who stated that the location was equipped with video surveillance cameras, which were later provided. Kaglos also provided a list of people who attended the club that night.

21.    Using surveillance cameras from different locations, Defendant Seel sent a single photograph of surveillance footage to Sgt. David Zayas of the Brooklyn South Gun Suppression Unit. Det. Zayas identified the individuals in the surveillance, including Brandon Lee. Significantly, none of the surveillance footage shows the crime or evidence that Mr. Lee committed the crime. Defendant Zayas also surmised that Krishon Hedge must have been present because of his friendship with Lee.[2]

22.    Defendant Seel suffered significant tunnel vision after his conversation with Zayas.

23.    11 days later, Daiqan Palmer was arrested based upon his connection to the black BMW SUV left at the scene. Palmer, who was the only witness that placed Mr. Lee at the scene of the shooting, was interrogated, coached, and coerced into implicating Brandon Lee in the shooting death of Jaquan Campbell by defendant Det. Seel. Palmer was only shown a single photograph of Mr. Lee even though Palmer had very little familiarity with Mr. Lee.

---

[2] The exchange here between Seel and Zayas shows the speculation and desperation to make an arrest.

24.    Campbell stated that he picked up Lee, along with Krishon Hedge and Darvin Guiteau on September 30, 2018. Campbell stated it was Lee's idea to go after the deceased, Jaquan Campbell.

25.    Daiqan Palmer stated that Lee was in the car at the time that Ms. Weston and Mr. Campbell were chased. Palmer stated that Lee handled the guns and was the person who fired the gun that killed Jaquan Campbell.

26.    Based upon Palmer's coerced statement, Defendant Seel falsely swore to a criminal complaint and falsely arrested Brandon Lee.

27.    Significantly, not long after Lee's arrest, forensic testing showed that while Palmer and others were connected to the guns, masks, and the black BMW SUV, Brandon Lee was excluded as a contributor to these items found at the scene.

28.    Defendant Seel and Defendant Klein ignored several individuals that were implicated outside of Palmer's statement, which excluded Lee.

<u>Grand Jury Presentation and Trial</u>

29.    Defendant Seel, dead set on prosecuting Brandon Lee, testified falsely before the grand jury with regard to Daijan Palmer's "confession". Upon information and belief, Daijan Palmer refused to testify before the grand jury because his statements to the defendants regarding Brandon Lee were false.

30.    Prior to Mr. Lee's trial, Daijan Palmer was once again coerced into falsely implicating Mr. Lee and testifying at trial.

31.    At trial, the jury had the chance to hear that Brandon Lee was excluded as ever handling any of the weapons or to have worn the gloves and facemasks found at the scene.

32.    Yet still, the defendants, including the Queens County District Attorney's Office (herein referred to as "QCDAO"), ignored the fact that there was no evidence implicating Brandon Lee and proving that their lone witness implicating Mr. Lee was wholly unreliable.

33.    Mr. Lee was acquitted and released from Rikers Island on January 24, 2024.

34.    The Defendants were on notice that there was no reliable evidence implicating Mr. Lee and, in fact, the physical and forensic evidence excluded Mr. Lee, however, the Defendants recklessly and/or maliciously ignored the unreliability of this evidence and pushed forward with the criminal prosecution of Mr. Lee.

35.    Within ninety days after the claim alleged in this Complaint arose, a written notice of claim was served upon defendants at the Comptroller's Office.

36.    At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

37.    This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

38.    Mr. Lee suffered damage as a result of defendants' actions.  Plaintiff was deprived of his liberty for over 5 years, suffered emotional distress, mental

anguish, fear, pain, bodily injury, anxiety, embarrassment, humiliation, an unlawful search and damage to his reputation.

## JURISDICTION

39.    This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1988, and the Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and pursuant to Article 1 §§ 1, 6, and 12 of the Constitution of the State of New York.

40.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the previously mentioned statutory and constitutional provisions.

41.    Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law that are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

42.    Venue is proper for the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

43.    Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

44.     Plaintiff BRANDON LEE is a citizen of the United States and was at all times relevant to this Complaint a resident of the State of New York.

45.     Defendant CITY OF NEW YORK ("City") is a municipal corporation created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department and does maintain the New York City Police Department ("NYPD") which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

46.     Defendant Detective JOHN SEEL ("Det. Seel") was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual and official capacity.

47.     Defendant Sergeant DAVID ZAYAS ("Sgt. Zayas") was at all times relevant to this Complaint a duly appointed and acting Sergeant of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  He is being sued in his individual and official capacity.

48.    Defendant Det. LIZBETH KLEIN ("Det. Klein") was at all times relevant to this Complaint a duly appointed and acting police officer of the NYPD, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. She is entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  She is being sued in her individual capacity.

49.    The Queens County District Attorney's Office ("QCDAO") was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within Queens County of the City of New York. It is an agency of Queens County, a constituent county of the City of New York.  The District Attorney; Assistant District Attorneys; and Queens District Attorney's investigators are deemed employees of both the County of Queens and the City of New York.

50.    In addition to the named individual defendants and Does #1-10, the QCDAO includes those individuals assigned to supervise and train Does #1-10.

51.    Defendant Does # 1-10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those other officers, detectives, supervisors, and/or other agents, and employees of the NYPD and QCDAO, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations,

policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein. They are entitled to indemnification under New York General Municipal Law Section 50-k and by contract. They are sued in their individual and official capacities.

52.     The lack of evidence of Mr. Lee's guilt and the exculpatory evidence in possession of the parties should have caused defendants to be concerned that they had wrongfully and/or, at least, incorrectly charged Mr. Lee and were wrongfully and incorrectly prosecuting him. This awareness should have caused them to reinvestigate and reconsider the charges and continuing the prosecution.

53.     Instead, the defendants disingenuously stuck to the script and scenario they created – that Mr. Lee was responsible for that crime.

54.     The defendants disingenuously stuck to this constructed scenario; withheld evidence that went against that scenario; ignored evidence that established that the witnesses against Mr. Lee were unreliable informants; maliciously acted to derail Mr. Lee's attempts to gain his freedom; obstructed the just and honest resolution to the crime and subjected Mr. Lee to over five years of wrongful imprisonment.

55.     Rather than question the integrity of their arrest and prosecution of Mr. Lee or admit its lack of integrity, the defendants, including those working in both the NYPD and the QCDAO, suppressed the truth about their unlawful actions, including, withholding of evidence, eliciting false testimony at trial, silencing honest

and corroborated statements constituting exculpatory evidence and conducted a Constitutionally inadequate investigation.

## LIABILITY OF THE INDIVIDUAL DEFENDANTS

56.    All the acts described above were committed by the individual defendants under color of state law and under their respective authorities as police officers, investigators prosecutors, supervisors, and employees, acting within the scope of their employment.

57.    The individual defendants, in committing the aforesaid conspiracies, acts, and omissions to act, were acting with actual malice; deliberately indifferent to; and in reckless disregard of, plaintiff's rights and thereby caused actual injuries to the plaintiff.

58.    The defendants, in committing the aforesaid acts, were acting as joint tortfeasors, described above, the individual defendants subjected Mr. Lee to loss of liberty and other deprivations of constitutional rights, including, but not limited to, deprivation of the rights to due process of law and protection from pain and suffering, severe and permanent emotional injuries, mental anguish as well as other psychological injuries, extreme emotional distress, shame, humiliation, indignity, damage to reputation, loss of earnings, and obliged them to pay for legal fees and expenses.

## MUNICIPAL LIABILITY

**For the Actions of the Police Personnel Pursuant to the Policies and Practices in Existence at the Time of the Investigation and Prosecution of Mr. Lee's Case**

59.    All of the acts by the police defendants described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agency, the New York City Police Department.

60.    Defendant City and the NYPD, by their policy-making agents, servants, and employees, authorized, sanctioned, and/or ratified the police defendants' wrongful acts; and/or failed to prevent to stop these acts; and/or allow or encouraged these acts to continue.

61.    The actions of police defendants resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by police officers, to prosecute and continue to prosecute persons through fabricated and manipulated allegation without adequate basis in fact and/or despite substantial exculpatory evidence known to them and withheld from accused persons, and to substantially interfere with the accused's right to call witnesses in their defense by impermissible means such as concealment, intimidation, coercion, and other abuses of authority.

62.    The existence of such unlawful *de facto* polices and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the NYPD and the City.

63.    Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy-making officers and officials of the NYPD and the City

and their predecessors in interest did not take steps to terminate these policies and practices, did not discipline individuals who engaged in such practices, or otherwise properly train police officers with regard to constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, customs, and practices through their deliberate indifference to or reckless disregard of the effect of said, policies, customs, and practices upon the constitutional rights of persons in the City of New York.

64.    The City's policies and practices in existence at the time of the conduct complained of herein, which caused the plaintiff's injuries herein include, *inter alia,* the following:

a.   The failure to properly supervise, train, instruct, and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

b.   The failure to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful accusatory instruments;

c.   The failure to properly supervise, train, instruct, and discipline police officers with regard to the adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

d.   The failure to properly supervise, train, instruct, and discipline police officers with regard to the exercise of their authority, including, without limitation, in regard to disclosure of exculpatory evidence;

e.  The failure to properly supervise, train, instruct, and discipline police officers with regard to proper methods of conducting interviews of witnesses and/or accused persons, and to discipline police officers who use improper methods to coerce and/or elicit false statements and/or confessions;

f.  The tacit acceptance of and encouragement of a code of silence wherein police officers regularly cover up police misconduct by refusing to report other officers' misconduct or by telling false and/or incomplete stories, *inter alia,* in sworn testimony, official reports, in statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau, and in public statements designed to cover for and and/or falsely exonerate accused police officers;

g.  Encouraging and/or failing to discipline officers for "testilying" and/or fabricating false evidence to bring about the police officers' preconceived perceptions or determinations of guilt.

h.  Having a policy whereby exculpatory evidence is not placed in the case file and are instead just held aside by the Police Department and the District Attorney's Office delaying or preventing such evidence being exchanged to defense counsel;

i.  Improper reliance on confidential informants who has little to no reliability;

65.  The City policies, practices, and customs in existence at the time of failing to supervise, train, instruct, and discipline police officers and encouraging their misconduct are further evidence, *inter alia,* by the following

66. The Report of the Commission to Investigate Allegations of Police

Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen

Commission"), dated July 7, 1994, states:

In the face of this problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputation tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus, there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision to investigations, police culture, training, and recruitment.

For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

Mollen Commission Report, p. 2-3.

a. Accordingly, in 1990, the Office of Special Prosecutor, which investigated charges of

police corruption was abolished.

b. The Mollen Commission concluded that police perjury and falsification of official

records is probably the most common form of police corruption facing the criminal

justice system…

…Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them,

…What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts

to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

Mollen Commission Report, p. 36, 40-41.

67. Since at least 1984, defendant City and the New York City Police Department have been on notice inadequate and that police officers joining the force, including, upon information and belief, individual defendant police officers herein, were disproportionately involved in misconduct and abuse. *See, e.g.,* Mayor's Advisory Committee on Police Management and Personnel Policy, Final Report, February 24, 1987.

68. The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations.

69. Prior to July 1993, the Civilian Complaint Review Board (CCRB), which is responsible for receiving and investigating complaints of police misconduct made by citizens against members of the New York City Police Department, operated as an agency of the New York City Police Department rather than as an independent, unbiased entity.

70. The unlawful stopping, investigating, and prosecution of minorities in New York City continues. *See* https://apnews.com/general-news-6849c7d5758248b98cb5cef905000d4f (Discussion of federal monitor based upon the City of New York's policies regarding stop and frisks in 2013).

71. During the 1980s, the early 1990s, and in and about the time frame of the Lee investigation, the CCRB received numerous complaints of police misconduct, but failed fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously minuscule number of cases.

j.  On average, in 1990-1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated only 3.3 percent of the total complaints received.

k.  The CCRB has also failed to recommend disciplinary action in the vast majority of its cases.

l.  On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases.

m.  Moreover, most of the complaints that are substantiated by the CCRB do not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 80 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90-day suspension.

n.  Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out-of-court settlements or judgments in civil actions. Meanwhile, on average, only about 107 complaints were substantiated annually by the CCRB in 1988-1992.

o.  The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994.

p.  More than $82 million was paid in damages to victims of police misconduct in 1352 cases between 1992 and 1995.

72.  In the vast majority of police misconduct cases that result in verdicts or substantial settlements for victims, defendant City imposes no discipline, either before or after resolution in court, almost never reopens an investigation previously conducted after such resolution, and sometimes promotes the abusive officer to a position of greater authority despite the judicial resolution.

73.  Former New York City Police Commission Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho more and prejudices, its cover-ups and silence, is reinforced every day in every way."

74.  Upon information and belief, police officers receive no training regarding how to conduct interrogations in a manner that will prevent false statements, and, in fact, are indoctrinated in the use of false promises, threats, and intimidation.

75.  Upon information and belief, defendant City and its agency, the New York City Police Department, failed to effectively screen, hire, train, supervise, and discipline their police officers, including the defendant police officers herein, for lack of truthfulness, and for their failure to protect citizens from the unconstitutional conduct of other police officers, thereby permitting and allowing the defendant

police officers to be in a position to elicit false testimony from witnesses and to fabricate evidence sufficient to secure convictions in violation of federal and state constitutional rights, and/or to permit these actions to take place with those officers' knowledge of consent.

76.  Upon information and belief, the defendant police employees herein were the subject of prior civilian and departmental complaints of misconduct that gave notice to or should have given notice to defendant City and its agency, the New York City Police Department, that the defendant police officers herein were likely to engage in conduct that would violate the civil and constitutional rights of the public, such as the conduct complained of by the plaintiff herein.

77.  As a result of the foregoing conscious policies, practices, customs and/or usages, defendant City and its agency, the New York City Police Department, permitted and allowed the employment and retention of individuals as police officers whose individuals circumstances place the public or segments thereof at substantial risk of being the victims of preconceived determinations of guilt.

78. Mr. Lee's injuries were a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein and in existence at the time of the incidents complained of herein and of the knowledge and repeated failure of the defendant City and the New York City Police Department to properly supervise, train, and discipline their police officers.

79. Defendant City knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the Fourth, Fifth,

Sixth, and Fourteenth Amendments to the United States Constitution and Article I,

§§ 1 and 6 of the Constitution of the State of New York, including, without

limitation, the plaintiff's freedom of deprivation of liberty without due process of the

law.

80. The defendant City is directly liable and responsible for the acts of the

individual police officer defendants for state law claims under the doctrine of

*respondeat superior.*

### For the Actions of the QCDAO Prosecutors and their Investigators Pursuant to the Policies and Practices in Existence at the Time of the Lee Case

81. All of the acts by the defendant prosecutors and their investigators

described above were carried out pursuant to policies and practices of the City of

New York which were in existence at the time of the conduct alleged herein were

engaged in with the full knowledge, consent, and under the supervisory authority of

the QCDAO.

82. Defendant City and the District Attorney's Office, by their policy-

making agents, servants and employees, authorized, sanctioned and/or ratified the

defendant prosecutors' and their investigators' wrongful acts; and/or failed to

prevent or stop these acts; and/or allowed or encouraged these acts to continue.

83. The actions of the defendant prosecutors and their investigators

resulted from and were taken pursuant to *de facto* policies and/or well-settled and

widespread customs and practices of the City, which are implemented by the

QCDAO, to prosecute and continue to prosecute persons through fabricated and

manipulated allegation without adequate basis in fact and/or despite substantial

exculpatory evidence known to them and withheld from accused persons, and to substantially interfere with the accused's right to call witnesses in their defense by impermissible means such as intimidation, coercion, and other abuses of authority.

84. The existence of such unlawful *de facto* policies and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the QCDAO and the City for a substantial period of time.

85. The current QCDA Melinda Katz has repeatedly acknowledged these past failings and constitutional infirmities prevalent in the QCDAO and NYPD during the time period involved in this case, which began during Richard Brown's administration.  See https://www.nytimes.com/2021/01/27/nyregion/melinda-katz-queens.html; https://gothamist.com/news/queens-da-melinda-katz-moves-expunge-60-convictions-linked-corrupt-nypd-officers;  https://www.nydailynews.com/new-york/nyc-crime/ny-prosecutor-misconduct-queens-20211212-4iocggscuvav3kd4euxpmv5bai-story.html

86. Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy-making officials of the QCDAO and the City and their predecessor in interest did not take steps to terminate these policies and practices, did not discipline individuals who engage in such practices, or otherwise properly train prosecutors and investigators with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned ad ratified these policies, customs and practices through their deliberate indifferent to or reckless

disregard of the effect of said policies, customs, and practices upon the constitutional rights of persons in the City of New York.

87.   The City's policies and practices in existence at the time of the conduct complained of herein, which caused the plaintiff's injuries herein include, *inter alia,* the following:

a. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators who participate with, conspire with, and advise police officers in using coercive interrogation techniques during the course of an investigation;

b. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators who conspire with police officers during the course of an investigation to prevent potential witnesses for the defense from testifying through coercive and intimidating tactics;

c. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators with regard to proper investigatory techniques and adequate evidence of crimes and to discipline those unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

d. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators during the course of an investigation to prevent persons being interviewed from having access to counsel.

e. The failure to properly supervise, train, instruct, and discipline prosecutors and investigators regarding the documenting and exchanging of exculpatory evidence

during the course of an investigation to prevent persons being wrongfully accused and incarcerated.

f. The failure to ensure that information given to on-duty assistant district attorneys by police officer and detectives is properly recorded, documented and shared with other assistant district attorneys and defense counsel;

g. Over-reliance on confidential informants who lack reliability;

h. Ignoring the long history of misconduct and unconstitutional practices of the Queens Auto Crime Unit;

88. The aforementioned City policies, practices, and customs of failing to supervise, train, instruct, and discipline prosecutors and investigators and encouraging their misconduct are evidence by the broad-sweeping prosecutorial misconduct detailed herein. Members of the QCDAO directly subjected Mr. Lee to wrongful arrest, prosecution and conviction. These prosecutors and investigators represent the corrupt investigative policies and practices of the QCDAO.

89. The City policies, practices and customs in existence at the time of failing to supervise, train, instruct, and discipline police officers and encouraging their misconduct are further evidenced, *inter alia,* by the Mollen Commission's conclusion that the same tolerance for perjury and falsifications that is exhibited among police officers is exhibited among QCDAO prosecutors and investigators. The Commission specifically noted that "several former and current prosecutors acknowledged-- 'off the record' – that perjury and falsifications are serious problems

in law enforcement that, though not condoned, are ignored." Mollen Commission, Report, p. 42.

## DAMAGES

90. The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the City and the NYPD and QCDAO Defendants caused Mr. Lee to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced Mr. Lee to serve over five years in jail for a crime he did not commit.

91. As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Lee sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for over 5 years; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; loss of income;  humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

92. Specifically, and as a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Lee sustained physical injuries and damages, including: physical pain and suffering;

personal injuries; infliction of physical illness; and inadequate medical care, for which he is entitled to monetary relief.

93.  When Mr. Lee was falsely arrested for this crime, he had a good ongoing relationship with family and friends, all of which relationships were cut off, aside from occasional prison visits, for the remainder of his imprisonment.

94.  Defendants' unlawful actions also caused Mr. Lee to suffer significant mental anguish; social stigma; restrictions on liberty; loss of property; interference with familial relationships; and financial burdens.

95.  All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## FEDERAL CLAIMS

### COUNT I
### 42 U.S.C. § 1983 4th and 14th Amendment Malicious Prosecution
*Against Seel, Klein and Zayas,*
*Does # 1-10*

96.  Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

97.  Defendants Seel, Zayas and Klein, and Does # 1-10, with malice and knowing that probable cause did not exist to arrest Plaintiff  and prosecute him for the crime for which he was acquitted, acting individually and in concert, caused Plaintiff to be arrested, charged, and prosecuted for that crime, thereby violating Plaintiff's clearly established right, under the Fourth and Fourteenth Amendments

of the United States Constitution, to be free of unreasonable searches and seizures. Specifically:

a. Defendants Seel, Klein and Zayas and Does # 1-10, acting individually and in concert, intentionally withheld exculpatory evidence from other police,  prosecutors and defense counsel and misrepresented to prosecutors, Plaintiff and his trial counsel, the grand jury, and the trial court exculpatory facts that vitiated probable cause against Plaintiff and eventually exonerated Plaintiff and impeached witnesses for the prosecution at trial and that there was evidence tending to prove that Plaintiff was innocent and that the murder of Jaquan Campbell was committed by others. These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to others and away from Plaintiff; and

b. Defendants Seel, Zayas and Klein and Does # 1-10, acting individually and in concert, substantially ignored and interfered with exculpatory evidence that vitiated probable cause against Plaintiff and ultimately impeached evidence introduced at trial, including the unreliability of the only piece of evidence against Mr. Lee, Daiqan Palmer;

c.  Defendants Seel, Zayas and Klein and Does # 1-10, acting individually and in concert, substantially provided false evidence against Mr. Lee as described above;

98.    The aforementioned Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights.

No police officer or member of a district attorney's office would have believed this conduct was lawful.

99. Plaintiff is completely innocent of the murder of Jaquan Campbell for which he was acquitted. The prosecution finally terminated in Plaintiff's favor on January 24, 2024, when he was acquitted and released from Custody.

100. As a direct and proximate result of these Defendant's actions, Plaintiff was for more than five years wrongly arrested and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

<u>COUNT II</u>
**42 U.S.C. § 1983 14th Amendment Deprivation of Liberty Without Due Process of Law and Denial of Fair Trial by Fabricating Evidence and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**
*Against Klein and Seel and*
*Does # 1-10*

101. Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

102. Defendants Seel and Klein and Does # 1-10, acting individually and in concert, deprived Plaintiff of his clearly established constitutional right under the Fourteenth Amendment of the United States Constitution, to a fair trial. Specifically:

a. Defendants Klein and Seel and Does # 1-10, acting individually and in concert, intentionally coached the only witness, Jaiqan Palmer and withheld exculpatory evidence from other police, prosecutors and defense counsel and misrepresented to prosecutors, Plaintiff and his trial counsel, the grand jury, and the trial court exculpatory facts that vitiated probable cause against Plaintiff and ultimately

exonerated Plaintiff and impeached witnesses for the prosecution at trial and that there was evidence tending to prove that Plaintiff was innocent and that the robberies were committed by others. These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to others and away from Plaintiff; and

b. Defendants Seel and Klein and Does # 1-10, acting individually and in concert, coached Jaiqan Palmer and substantially ignored and interfered with exculpatory evidence that vitiated probable cause against Plaintiff and that ultimately impeached evidence introduced at trial, including the unreliability of the informants against Mr. Lee;

c. Defendants Seel and Klein and Does # 1-10, acting individually and in concert, substantially provided false evidence against Mr. Lee as described above;

103.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional right to be free from deprivation of liberty without due process of law.

104.    Plaintiff is completely innocent of the murder of Jaquan Campbell for which he was acquitted. The prosecution finally terminated in Plaintiff's favor on January 24, 2024, when he was acquitted and released from custody.

105.     As a direct and proximate result of these Defendant's actions, Plaintiff was for more than five years wrongly arrested and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III
### 42 U.S.C. § 1983 Failure to Intercede
*Against Seel, Klein, and Zayas and,*
*Does # 1-10*

106.     Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

107.     By their conduct and under color of state law, Defendants Seel, Klein, and Zayas, Does # 1-10 had opportunities to intercede on behalf of Plaintiff to prevent his false arrest, malicious prosecution, false imprisonment, deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

108.     These Defendants' failures to intercede violated Plaintiff's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in or after 2018 would have believed that failing to intercede to prevent these Defendants from withholding material, exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Plaintiff to be arrested and prosecuted without probable cause, were lawful.

109.     Plaintiff is completely innocent of the murder of Jaquan Campbell for which he was acquitted. The prosecution finally terminated in

Plaintiff's favor on January 24, 2024, when he was acquitted and released from custody.

110.    As a direct and proximate result of these Defendant's actions, Plaintiff was for more than five years wrongly arrested and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

<u>COUNT IV</u>
42 U.S.C. § 1983 Civil Rights Conspiracy
*Against Seel, Klein, and Zayas and*
*Does # 1-10*

111.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

112.    Defendants  Seel, Klein, and Zayas and Does # 1-10, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals conspired to act in concert in order to deprive Plaintiff of this clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

113.    In furtherance of the conspiracy, these Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a. Falsely arresting and imprisoning Brandon Lee, knowing that they lacked probable cause;

b. Fabricating inculpatory evidence in statements, reports, witness statements and pretrial communications with the prosecution;

c.  Committing perjury during hearings and at trial;

d.  Eliciting false testimonies to implicate Plaintiff; and

e.  Intentionally or with deliberate indifference, failing to comply with their duty to

disclose *Brady* material during the pendency of the case.

114.    Defendants acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his clearly established Fourth and Fourteenth Amendment right to be free from malicious prosecution, false imprisonment, deprivation of liberty without due process, and to a fair trial.

115.    Plaintiff is completely innocent of the Jaquan Campbell murder for which he was acquitted. The prosecution finally terminated in Plaintiff's favor on January 24, 2024, when he was acquitted and released from custody.

116.    As a direct and proximate result of these Defendant's actions, Plaintiff was incarcerated for more than five years, wrongly arrested, and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT V
**42 U.S.C. § 1983 Supervisory Liability**
*Against The City of New York and QCDAO*

117.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

118.    The individual defendants acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by their supervisors in this case and as a matter of practice.

119.    Defendants' supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendants and thereby caused the individual defendants to deprive Plaintiff of his clearly established constitutional rights, including his rights to be free from malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

120.    Had Defendants' supervisors not provided grossly inadequate training, supervision, and discipline of the defendant police officers, these defendants would not and should not have caused Plaintiff to continue to be maliciously prosecuted without probable cause.  Defendants' supervisors were directly involved in the investigation of Plaintiff and directly supervised the specific investigative acts taken by the individual defendants in this case.

121.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants' supervisors under color of state law violated their clearly established duty to supervise defendants Zayas, Seel and Klein and Does #1-10, and no reasonable supervisor would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinates was lawful.

122.    Plaintiff is completely innocent of the Jaquan Campbell murder for which he was acquitted. The prosecution finally terminated in Plaintiff's favor on January 24, 2024, when he was acquitted and released from custody.

123.    As a direct and proximate result of these Defendant's actions, Plaintiff was incarcerated for more than five years, wrongly arrested and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT VI**
42 U.S.C. § 1983 *Monell* Claim
*Monell* **Unconstitutional Policy, Custom, or Pattern and Practice of Promoting, Facilitating, or Condoning Improper, Illegal and Unconstitutional Investigative Techniques and Failure to Supervise, Disciple, and Train**
*Against Defendant City of New York for the Actions and Omissions of the Police Officer Defendants and the NYPD*

124.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

125.    Prior to and at the time of the unlawful investigation, prosecution, and conviction, of Plaintiff, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning, improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) the use of suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false statements and testimonies; (b) the use coercive tactics, intimidation, undue suggestion, and unlawful bribery to interfere with a criminal defendant's right to call witnesses; (c) the fabrication of inculpatory evidence; (d) the suppression of exculpatory and/or impeachment evidence; (d) the intentional failure to conduct adequate investigations of crimes; (e) proceeding in the arrest and prosecution of individuals despite evidence of their innocence; (f) unreasonable

reliance on confidential informants and (g) engaging in affirmative concealment and cover up of this type of misconduct.

126.     Prior to and at the time of the unlawful investigation, prosecution, and conviction of Plaintiff, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately supervise, discipline and train NYPD detectives and officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting custodial interrogations and witness interviews.

127.     The NYPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to adequately supervise, discipline, and train NYPD Department detectives and officers was reflected by the multiple acts of misconduct and illegality committed by multiple New York City Police detectives and supervisors in relations to multiple witnesses in the Plaintiff's investigation, as described above.

128.     The NYPD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and train was also reflected by several prior cases and investigations which, upon information and belief, were known to the NYPD defendants and policymakers prior to and during the Plaintiff's investigation. The misconduct committed in those cases was actually or constructively known to the NYPD supervisors and policymakers prior to and

during the Lee investigation, and upon information and belief, NYPD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate detectives and officers in response to such notice or make any meaningful investigation into the above practices and techniques. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Plaintiff including:

(a) the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

(i)     The Constitutional duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings;

(ii)    the continuing Constitutional obligation to correct false, inaccurate incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred;

(iii)   the continuing Constitutional duty to conduct and adequate investigation and to timely disclose to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information; and

(iv)    the Constitutional duty to refrain from coercing or manufacturing false

inherently unreliable statements and testimony from witnesses; and

(b)    The failure to adequately instruct, train, supervise, and discipline their employees

with respect to such matters and

(c)    The aforesaid policies, procedures, regulations, practices and/or customs

(including the failure to properly instruct, train, supervise and/or discipline

employees with regard thereto) were deliberately implemented or tolerated by

policymaking officials for the Defendant City, including, but not limited to, the

NYPD, District Attorney of Queens County and their delegates, who knew:

(i)    to a moral certainty that such policies, procedures, customs practices and/or policies

concern issues that regularly arise in the investigation and prosecution of criminal

cases;

(ii)    that such issues either present employees with difficult choices of the sort that

instruction, training and/or supervision will make less difficult or that the need for

further instruction, training and/or discipline was demonstrated by a history of

employees mishandling such situations as well as the incentives that employees

have to make the wrong choices;

(iii)    that the wrong choices by municipal employees concerning such issues will

frequently cause the deprivation of the Constitutional rights of an accused and

cause him Constitutional injury.

129.    The aforementioned policymaking officials had the knowledge alleged

in the preceding paragraphs based upon, among other circumstances:

(a) Numerous credible allegations, many substantiated by judicial decisions, that members of the NYPD had violated their Brady and disclosure obligations, had presented or failed to correct false or misleading testimony and argument, or had improperly importuned or coerced inherently unreliable statements or testimony from witnesses;

(b) numerous decisions of the United States Supreme Court; the United States Court of Appeals for the Second Circuit; The New York Court of Appeals; The various Department of the Appellate Division of the Supreme Court of the State of New York; discussing the difficult issues that regularly arise under the Brady rule and the failure of police officers in New York State including in Queens County to properly comply with that rule;

(c) judicial decisions putting the NYPD, QCDAO on notice that the City could be held liable for its failure to adequately train, supervise or discipline its police officers and ADAs regarding their Brady and related disclosure and due process obligations including conducting a Constitutionally adequate investigation; *see, e.g. Walker v. City of New York,* 972 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York,* 285 A.D.2d 284 (1st Dep't 2001); and

(d) the inherent obviousness of the need to train, supervise and discipline police officers and ADAs in their aforementioned Constitutional obligations to counteract the inherent pressure on police and prosecutors to obtain convictions.

130.    Such unconstitutional municipal customs, practices and/or polices were the moving force behind the withholding of evidence and false testimonies,

statements and coercive tactics used against Plaintiff, causing his arrest, prosecution, and over five years of incarceration, as well as the other grievous injuries and damages set forth above.

## COUNT VII

### *Monell* Unconstitutional Policy, Custom, or Pattern and Practice of Promoting, Facilitating, or Condoning Improper, Illegal, and Unconstitutional Investigative Techniques and Failure to Supervise, Discipline and Train
*Against Defendant City of New York and QCDAO for the Actions and Omissions of the QCDAO Defendant*

131.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

132.    At the time of Plaintiff's arrest and prosecution and continuing through the time the charges against Plaintiff were dismissed, the QCDAO, as the manager, chief administrator and policymaker of the QCDAO, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his or her employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Queens, New York.

133.    Among other things, QCDAO engaged in a custom and practice of engaging in malicious prosecutions by: (a) knowingly presenting false testimony and arguments at criminal proceedings; (b) suppressing *Brady* information; and (c) covering up these unlawful practices and by the methods listed in the paragraphs supra.

134.    These policies, customs, and practices began with Richard Brown's induction as QCDA in 1991 and persisted throughout the time involved in this case.

135.      The QCDAO, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors working with the QCDAO.  These policies, customs, and practices proximately caused the violations of Plaintiff's constitutional rights described above and his malicious prosecution, false imprisonment and other damages.

136.      The QCDAO's policy was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligation to not maliciously prosecute defendants.  The QCDAO's deliberate indifference to such violations created an atmosphere that "anything goes" and prosecutions should be secured at all costs that caused such violations to continue, including in Plaintiff's case.

137.      Under the QCDAO's office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to avoid disclosing information favorable to the defense and presenting false evidence to grand juries and trial juries, despite the fact that disclosure of such information and the obligation not to present false evidence was and is constitutionally required.

138.      The QCDAO's training and discipline policies and practices were likewise consciously designed to permit and encourage malicious prosecutions.

139.      Prosecutors were trained not to disclose *Brady* and other information favorable to a defendant by misrepresentation or rationalizing non-disclosure by subjectively assessing the information as unreliable and encouraged to cover up *Brady* information kept hidden by other members of the QCDAO. Prosecutors were

also trained to ignore unreliable information and move forward with prosecutions no matter how much evidence refuted the evidence presented to the jury.

140.    Through a policy, custom, and practice of not disciplining prosecutors for *Brady* and other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), the QCDAO encouraged such violations by demonstrating to prosecutors that there would be no negative consequences for the failure to comply with *Brady* and other constitutional requirements.

141.    Upon information and belief, despite numerous court decisions finding that prosecutors had maliciously prosecuted defendants by failing to disclose *Brady* and other information favorable to a defendant or otherwise had engaged in conduct that misled courts, juries, defendants, and/or defense attorneys, none of the QCDAO prosecutors or investigators involved was disciplined.

142.    Upon information and belief, under the QCDAO's policies, customs, and practices, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

143.    Upon information and belief, even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible.

144.    Upon information and belief, no prosecutor was reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

145.    To the contrary, in opposing Plaintiff's and other criminal defendants' efforts to obtain *Brady* and other information favorable to the Plaintiff and other defendants, or relief for a prosecutor's improper failure to provide such disclosure or lying and misrepresenting evidence and presenting a fraud upon the court, the QCDAO stubbornly defended the propriety of their employees' behavior, thereby ratifying and signaling their tolerance of it.  Upon information and belief, personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions.

146.    The violations of Plaintiff's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct chargeable to defendant City of New York amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the QCDAO, including:

a.  The institution and implementation of inadequate and unlawful policies, procedures and customs concerning:

i.    the duty not to use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including grand jury proceedings, pretrial hearings, and trials;

ii.    the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred; and

iii.      the continuing duty to obtain, preserve, and timely disclose, during criminal prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses and the prosecution's theory of the case; and

b.  the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

147.    The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto) were implemented or tolerated by policy making officials for the defendant City, including, but not limited to the QCDAO which knew to a moral certainty that such policies, procedures, regulations, practices and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases; that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for the further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make wrong choice; and that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

148.    The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances: as

noted above, numerous credible allegations, many substantiated by judicial

decisions, that prosecutors and investigators wrongfully withheld evidence

favorable to the defense that the prosecution had been required to timely disclose to

the defense under *Brady* or state discovery laws and/or had presented or failed to

correct false or misleading testimony and argument; numerous decisions of the

United States Supreme Court, the United States Court of Appeals for the Second

Circuit, the New York Court of Appeals, and the New York Appellate Division,

discussing the difficult issues that regularly arise under the *Brady* rule and the

failures of the New York City or QCDAO prosecutors with that rule; judicial

decisions putting the QCDAO on notice that the City could be held liable for its

failure to adequately train, supervise, or discipline prosecutors regarding their

*Brady* and related due process obligations, including their obligations not to abuse

judicial process; the need to train, supervise and discipline prosecutors in their

aforementioned constitutional obligations to counteract the inherent pressure on

prosecutors to obtain convictions.

149.    Despite this knowledge, the supervisory and policymaking officers

and officials of the defendant City, including the QCDAO, perpetuated or failed to

take preventative or remedial measures to terminate said policies, procedures,

regulations, practices and/or customs; did not effectively instruct, train, and/or

supervise their personnel with regard to the proper constitutional and statutory

requirements in the exercise of their authority; had no published practices, policies

or procedures for investigating and disciplining prosecutors who had engaged in

violations of *Brady* and related constitutional obligations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practice and/or customs, described above, with deliberate indifference to the effect this would have upon the constitutional rights of individuals and citizens of the City and State of New York.

150.    The QCDAO further exhibited an indifference towards this type of misconduct by its hiring and retention of Daniel McCarthy in 1992 who subsequently became the head of trial training for the office in 1994. Yet in 1990, just two years before McCarthy's hiring, a Queens County Supreme Court judge found that McCarthy had engaged in a scheme to withhold *Brady* material from a defense attorney, in the case of *People v. Steadman and Blair*, Ind. # 3331/1988. The Court of Appeals in *People v. Steadman*, 82 NY2d 1, 7 (1993) found that McCarthy had "personally" engaged in a "studied effort" to conceal *Brady* material. Despite these decisions, McCarthy was named head of training.

151.    The QCDAO's deliberate indifference to violations by subordinates of the Office's Constitutional obligations foreseeably encouraged such violations to occur and was a substantial cause of the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and prosecution.

152.  The aforesaid policies, practices and customs of defendant City of New York were collectively and individually a substantial factor in bring about the

aforesaid violations of Plaintiff's rights under the Constitution and laws of the United States, and in causing his malicious prosecution and resulting damages.

153.    Under the principles of municipal liability for federal civil rights violations, the QCDAO has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in the office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations to make timely disclosure of exculpatory or favorable evidence or *Brady* materials to the defense and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during grand jury proceeding, pretrial hearings, and at trial.

154.    The QCDAO through its delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel, hiring, training, supervision and discipline, with respect to his Office's performance and its duties.

155.    The QCDA at all relevant times was and is an elected officer of Queens County, one of the constituent counties of defendant City of New York, and the Office was and is funded out of the City's budget.

156.    Furthermore, the District Attorney was and is designated a "local officer, rather than a "state officer," under the New York Public Officers Law § 2, and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including Queens County), and hence defendant City itself,

shall have liability for torts committed by County officers and employees, such as the District Attorney and his employees and agents.

157.    At all relevant times, the QCDA, personally and/or through his or her authorized delegates, had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

158.    By virtue of the foregoing, defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resulting injuries.

## COUNT VIII

### FALSE ARREST AND FALSE IMPRISONMENT PURSUANT TO § 1983
*Against Seel, Klein, and Zayas and*
*Does # 1-10*

159.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

160.    Defendants, acting individually and in concert, violated the Fourth and Fourteenth Amendments because they arrested plaintiff without probable cause on October 23, 2018.

161.    The Defendants fabricated evidence to arrest Mr. Lee

162.    Mr. Lee was/is completely innocent of the murder of Jaquan Campbell.

163.    Plaintiff was conscious of his confinement.

164.    Plaintiff did not consent to his confinement.

165.    Plaintiff's confinement was not otherwise privileged.

166.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

167.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## STATE LAW CLAIMS

### COUNT IX
**False Arrest, False imprisonment and Malicious Prosecution**
*Against All Defendants,*

168.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

169.    Defendants despite knowing that probable cause did not exist to arrest and prosecute Plaintiff, intentionally, recklessly, and with malice caused Plaintiff to be prosecuted and convicted for this crime. Furthermore, these Defendants intentionally concealed and misrepresented to prosecutors, grand jurors, the trial court, and courts of post-conviction hearings facts that further vitiated probable cause against Plaintiff.

170.    A notice of claim was duly filed against the City of New York on or about February 5, 2024, in compliance with General Municipal Law 50-(e) and (i).

171.    Plaintiff was deposed in accordance with General Municipal Law section 50(h) on or about May 2, 2024.

172.    More than thirty (30) days have passed since such testimony and the claim has not been adjusted or settled.

173.    Plaintiff has satisfied all conditions precedent to filing this lawsuit under law.

174.    Mr. Lee is completely innocent of the crimes for which he was convicted. The prosecution finally terminated in Mr. Lee's favor on January 24, 2024, when he was acquitted and released from prison.

175.    As a direct and proximate result of these defendant's actions, Plaintiff spent more than five years wrongly arrested, imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT X
*Respondeat Superior* Claim
*Against Defendant City of New York*

176.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

177.    At all times relevant to this Complaint, Defendants Seel, Klein and Zayas Does #1-10 acted as agents of the City of New York, in furtherance of the business, including law enforcement functions, of the City of New York, and within the scope of their employment or agency with the City of New York.

178.    The conduct by which the Defendants committed the torts of false arrest, malicious prosecution and negligence was not undertaken for the individual Defendant's personal motives, but rather was undertaken while the Defendants were on duty, carrying out their routine investigative functions as detectives, investigators, police officers and Assistant District Attorneys.

179. Under the doctrine of *respondeat superior,* the City of New York is liable for their agents' state law torts of false arrest, malicious prosecution and negligence.

180. Plaintiff is completely innocent of the crimes for which he was falsely arrested and imprisoned.

181. The prosecution finally terminated in Plaintiff's favor on January 24, 2024, when the Plaintiff was acquitted and released from custody.

182. As a direct and proximate result of these defendants' actions, Plaintiff spent more than five years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT XI**
**New York State Constitution**
*Against Seel, Klein, Zayas and*
*Does # 1-10*

183. Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

184. The conduct of Defendants Seel, Klein, and Zayas and Does #1-10 described above, also violated Plaintiff's rights under the New York State Constitution, Article I §§ 6 to due process of law.

185. Plaintiff is completely innocent of the crimes for which he was falsely arrested and imprisoned.

186. The prosecution finally terminated in Plaintiff's favor on January 24, 2024, when Plaintiff was acquitted and released from Custody.

187.    As a direct and proximate result of these defendant's actions, Plaintiff spent more than five years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

### A JURY TRIAL IS DEMANDED ON ALL THE FOREGOING COUNTS

**WHEREFORE**, Plaintiff BRANDON LEE prays as follows:

(a)    That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial but no less than $50 Million;

(b)    That the Court award punitive damages to him against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

(c)    For a trial by jury;

(d)    For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(e)    For any and all other relief to which he may be entitled.

Dated:  April 23, 2025                          Respectfully Submitted,

s/ Justin Bonus

JUSTIN C. BONUS ATTORNEY AT LAW
BY: Justin Bonus
118-35 Queens Blvd
Suite 400
Forest Hills, NY  11375
347-920-0160
Justin.bonus@gmail.com